IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:04-CR-544 TS |
| | ) | |
| v. | ) | **REPORT & RECOMMENDATION** |
| | ) | **Re:  2/10/04 Search** |
| JOHN ROMAN, | ) | |
| | ) | District Judge Ted Stewart |
| Defendant. | ) | Magistrate Judge David Nuffer |

Defendant Roman filed a Motion to Suppress all evidence seized from his home on February 10, 2004 as well as statements he made to officers at that time.[1]  (Dkt. no. 15.)  The case was referred to the Magistrate Judge under 28 U.S.C. § 636(b)(1)(B).

On March 2, 2005, the Magistrate Judge held a hearing on the motion at which Mary Corporon represented Defendant, and Drew Yeates represented the government.  Following the hearing, the parties submitted additional briefing.

---

[1]In his motion, Defendant also requested suppression of evidence seized in the search of his vehicle. However, the government states that the police reports do not indicate that Defendant's vehicle was searched. (Gov.'s Opp'n to Def.'s Mot. to Suppress at 2, Dkt. no. 31.)

# I. FACTS

## A.  Officer Hulst

Officer Debbie Hulst of the West Valley City Police Department testified that around 5:00 p.m. on February 10, 2004, she was dispatched to 4239 S. 4580 West.  (Tr. 12-13.)  The dispatch was originally classified as a "fire assist," but Officer Hulst re-classified it in her report as "suspicious activity."  (Tr. 13.)  Officer Hulst responded with Officer Wyckoff to the address which was a single family home with an attached carport.  Officer Hulst made contact at the front door with Defendant Roman.  Defendant's wife, Cheryl Roman, was also present in the house. (Tr. 14.)  Officer Hulst arrived at the address about 5:15 p.m.  (Tr. 25, 27.)

Defendant had called the police to his residence because he was concerned about "a large amount of chemicals" that someone had placed in his carport.  (Tr. 15.)  Officer Hulst stated that Defendant did not seem at all apprehensive about talking to police, but he was very concerned about the chemicals.  She did not advise him of his <u>Miranda</u> rights because he was the one who had called the police and "he just had some questions as to what he had found in his carport." (Tr. 15.)  Defendant gave Officer Hulst several names of people who had put the chemicals there (Tr. 16, 30), and stated that he was afraid of these people.  (Tr. 29-30.)  He also stated that these people were making false identifications, forging documents, and stealing items.  (Tr. 31.)  This initial conversation took place on the front porch of residence.  (Tr. 15, 29, 31.)

Defendant and Officer Hulst then walked over to the carport where Officer Wyckoff was standing.  (Tr. 16.)  Officer Wyckoff looked at the chemicals and told Officer Hulst that he

suspected they had something to do with drug manufacturing.  Officer Wyckoff then used his cell phone to call the Neighborhood Narcotics Unit (NNU).  (Tr. 32, 33-34.)

Officer Hulst and Defendant then went into the house where they were joined by Officer Wyckoff following the phone call.  Officer Hulst testified that Defendant invited the officers into the house.  After they were inside, Officer Hulst asked Defendant to fill out a witness statement. (Tr. 17, 34.)  She testified that at that time, she considered Defendant to be a complainant and witness, but not a suspect (Tr. 20), and thus still had not advised him of his <u>Miranda</u> rights.  (Tr. 35.)

Officer Hulst spoke with Defendant's wife, Cheryl Roman, who also appeared very concerned about the chemicals.  (Tr. 20.)  Officer Hulst testified that she did not advise Mrs. Roman of her <u>Miranda</u> rights because she was not a suspect and was not being detained.  (Tr. 20-21.)  Officer Hulst also had Mrs. Roman fill out a witness statement.  Cheryl Roman told Officer Hulst that a couple of weeks earlier, somebody had come over and exchanged words with Defendant and then the chemicals appeared in the carport. (Tr. 21.)  In addition, she stated that a friend of the Romans, Sheri Edwards, had asked to stay at their residence for a couple of days. When she moved out, she left behind some drug paraphernalia.  (Tr. 22-23, 36-37.)  Cheryl Roman showed Officer Hulst the paraphernalia, which consisted of a drug pipe and some filtering screens.  Officer Hulst testified that she did not ask Mrs. Roman to show her the paraphernalia.  (Tr. 23.)

At that point, Officer Hulst became suspicious that there was some kind of drug activity going on at the house.  (Tr. 38.)  Consequently, she asked Cheryl Roman if she and her husband used drugs.  (Tr. 23, 39.)  Mrs. Roman responded that they both used drugs on a regular basis.  (Tr. 23-24, 39.)  Officer Hulst testified that Mrs. Roman was not in custody.  (Tr. 23.)  At the time she talked about the drug activity, she was seated in the living room, and was free to stop the conversation, or to leave the home.  However, she did not indicate that she wished to do so.  (Tr. 45.)

Officer Hulst testified that the conversation with Cheryl Roman did not change the focus of the investigation which was to find out what the chemicals were, and why they had been left in the carport.  (Tr. 24.)  During the conversation, Mrs. Roman did not appear apprehensive to speak with Officer Hulst.  However, she was very afraid for the safety of her home, family and pets.  (Tr. 24, 37-38.)

After the officers had been at the house about fifteen to thirty minutes, the NNU detectives arrived and took over the investigation.  (Tr. 25, 27-28, 41, 44.)  Officer Hulst testified that the NNU officers just walked in through the front door; she did not invite them in.  (Tr. 40-41.)  After NNU took over, Officer Hulst stayed on the scene to make sure it was secure for officer safety reasons.  (Tr. 41-42.)  During the NNU investigation, she remained in the living room with Cheryl Roman.  (Tr. 41, 43.)  Officer Wyckoff also stayed at the scene, but he was in some other part of the premises.  (42.)  Officers Hulst and Wyckoff left when the NNU detectives finished their investigation.  (Tr. 42.)  She estimated that she was at the scene between one and

4

two hours, and departed sometime between 6:15 and 7:15 p.m.  (Tr. 27-28.)  Finally, she

acknowledged that she was not willing to leave the house until NNU finished the investigation.

During the encounter, Officer Hulst was in uniform and wearing a sidearm.  (Tr. 46.)

**B. Officer Wyckoff**

Officer Justin Wyckoff of the West Valley City Police Department testified that when the

officers were dispatched to the residence, the call went out as a "fire assist" which meant that

someone had called the fire department, and the fire department had called the police department

to assist them.  (Tr. 49-50.)  Officer Wyckoff met Officer Hulst at the residence.  (Tr. 50, 62.)

Officer Wyckoff went to the carport area while Officer Hulst went to the front door.  (Tr. 51, 63.)

When Officer Wyckoff looked in the carport he saw a lot of brown cardboard boxes

containing various types and sizes of bottles.  (Tr. 52.)  He was able to read the labels on three of

the bottles, but had no knowledge of the chemicals they contained.  (Tr. 52-53, 64.)  Because

Officer Wyckoff knew that suspicious chemicals could be indications of drug manufacturing, his

suspicions were immediately aroused.  (Tr. 64, 71.)  He was also concerned that the materials

might be a fire hazard.  (Tr. 52.)  Officer Wyckoff then called Detective Ward of the West Valley

Police narcotics division to come and identify the chemicals.  (Tr. 53-54.)  After he called

Detective Ward, Officer Wyckoff went into the house and joined Officer Hulst and Defendant.

(Tr. 55, 66.)  Officer Wyckoff stated that because Defendant was not a suspect at that point, and

was not being detained, he did not read him his <u>Miranda</u> rights.  (Tr. 56-57.)

Officer Wyckoff stated that while they were in the kitchen area, Defendant asked him to follow him downstairs. (Tr. 56-57, 67.) He followed Defendant into the basement where Defendant began talking about people leaving things at his house, a check and an ID, underneath the keyboard of his computer in his hobby room. (Tr. 57, 67-68.) Defendant was concerned that these people had been forging checks and identifications. (Tr. 67-68.) Officer Wyckoff did not initiate the conversation, and Defendant's statements were unsolicited. (Tr. 57.) Defendant did not appear at all apprehensive about speaking to him or showing him around the house. (Tr. 57-58.) While he was in the basement room which appeared to be a storeroom, Officer Wyckoff saw a computer, a handgun in a holster, a couple of rifles, and some boxes. Officer Wyckoff did not ask Defendant about the guns. (Tr. 58.) The conversation in the basement only lasted about two minutes, and then they went back upstairs. (Tr. 58-59, 69.) Officer Wyckoff did not book anything into evidence or make any arrests. (Tr. 59.)

After about fifteen or twenty minutes, the NNU detectives arrived. (Tr. 59.) Officer Wyckoff stated that he remained on the scene to secure the location, and to assist the detectives in case they wanted someone transported to jail or something booked into evidence. (Tr. 59-60, 70.) He admitted that he intended to stay at the house until NNU concluded the investigation. (Tr. 70, 71.) Officer Wyckoff left the house when the detectives were leaving. He testified that he was never asked to leave the house. (Tr. 60.)

**C. Detective Lynes**

Michael Lynes, a detective with the Neighborhood Narcotics Unit, testified that on February 1, 2004, he was in Rancho Cordova, California for some training when he received a phone call from Defendant. (Tr. 75.) Detective Lynes was previously acquainted with Defendant. (Tr. 76, 107-08.) Defendant had called requesting assistance in regard to something that had just occurred at his residence, but he would not elaborate on what it was. Defendant sounded quite concerned. Detective Lynes told him that he was out of town, but he would be back on the tenth and would contact him then. (Tr. 76.)

Around noon on February 10, 2004, Defendant left a message on Detective Lynes's phone sounding "real panicky." (Tr. 77.) Detective Lynes tried to return the call three times, but did not reach him. (Tr. 77.) About 5:00 that afternoon, Detective Lynes noticed a call come over the radio to assist the fire department with possible "clan lab" chemicals. (Tr. 77-78, 92-93.) When Detective Lynes noticed that Defendant was the complainant, he decided to respond to the residence. (Tr. 78, 93.) When he arrived, the two patrol officers, Wyckoff and Hulst, were already there inside the house with Defendant and his wife. (Tr. 78-79, 94.) Detective Lynes knocked on the door which was opened by Officer Hulst. (Tr. 80, 95.)

Detective Lynes then entered the house and made contact with Defendant in the kitchen. (Tr. 80, 96.) At that time, Detective Lynes did not consider Defendant to be a suspect. (Tr. 80.) Defendant told Detective Lynes that somebody, an unknown person, had dropped off a bunch of chemicals in the carport. (Tr. 81-82.) Initially, he stated that it happened about three weeks ago,

7

and then he said it was the night that he had called Detective Lynes in California on February 1. (Tr. 82.)

Detective Lynes did not give Defendant his Miranda rights because he was not a suspect, not in custody, and not being detained.  (Tr. 82.)  Detective Lynes testified that the purpose of his investigation was to determine what the chemicals actually were, whether they were part of a clan lab, who had put them there, and why.  (Tr. 85.)

Detective Lynes conversed with Defendant in the kitchen for a few minutes using a casual tone of voice.  (Tr. 83-84.)  Detective Lynes described Defendant's demeanor as "extremely panicky," and "sort of paranoid."  Detective Lynes stated that based on his experience, Defendant seemed to under the influence of meth.  He was kind of jittery and jumpy, and wasn't making much sense.  However, he did not seem to be apprehensive about having Detective Lynes in the house.  (Tr. 85, 97.)

Defendant then took Detective Lynes to the carport where he showed him the boxes of chemicals and some glassware.  (Tr. 84.)  Defendant stated that some people left the chemicals there.  He gave the detective a couple of names, but a computer check did not reveal any matches.  (Tr. 85-86, 99-100.)  Defendant kept referring to them as "the people."  After they had gone back into the kitchen, Defendant told the detective that these people had cooked meth on his back porch.  Detective Lynes then asked him if he used meth.  Defendant replied that he had used it a week earlier.  (Tr. 86, 102-03.)

8

Defendant told Defendant Lynes that he needed to show him some stuff in his hobby room.  (Tr. 87, 98.)  Defendant Lynes followed him downstairs where Defendant showed him "where he had a computer and some stuff stolen."  (Tr. 87.)  Defendant also stated that some ID's had shown up and were lying around, and then disappeared.  While in the basement, Detective Lynes noticed some firearms in plain view, including a rifle, a shotgun, a couple of handguns, and a large amount of ammunition.  (Tr. 87.)  Detective Lynes asked Defendant why he had all those guns lying around.  Defendant responded that they were "for protection."  (Tr. 87-88.)  Detective Lynes asked from whom he needed protection, and Defendant responded, "the people."  (Tr. 88.)  Following this conversation, they went back upstairs to the kitchen.  (Tr. 88, 100.)

Once upstairs, Defendant stated that "people had dropped stuff off at his house.  He didn't know what was in his home, that people had just–would bring stuff and drop it off."  (Tr. 88, 104.)  Detective Lynes asked, "Can we check your house for anything that these people might have dropped off?"  (Tr. 88, 104.)  Plaintiff responded that they could.  (Tr. 88.)  In explaining what the officers were looking for, Detective Lynes stated:  "Whatever these people had dropped off.  He had said–he had mentioned the lab that had been there, the chemicals that were in the carport.  He mentioned the IDs and what was believed to be forgery-type items, and drugs that people may have dropped off."  (Tr. 88-89.)  Detective Lynes stated that although he did not ask Defendant to sign a written consent form, he did obtain oral consent for the officers to look around.  (Tr. 89.)

9

In the bedroom, Detective Lynes found a glass pipe of a type commonly used for smoking illegal substances like meth, a stone pipe commonly used for smoking marijuana, a bunch of miscellaneous pills, and a .25 caliber handgun. Detective Lynes testified that at that point Defendant still had not become a suspect. (Tr. 89.)

At some point, Defendant mentioned to Detective Lynes that he had used the handgun to point at a person, who was involved in drugs, to get him to leave the house. (Tr. 89-90, 104.) After Defendant made the statement about pointing the gun and the officers had discovered the paraphernalia, Detective Lynes asked Detective Evans to give Defendant his <u>Miranda</u> rights and interview him. (Tr. 90-91.) Detective Lynes then took possession of the guns and ammunition because he felt that it was not safe for them to be in the house. (Tr. 91, 104-05.) Detective Lynes also seized the pipes and the pills. (Tr. 106, 107.) He stated that his reason for taking the pharmaceutical pills was that they were not packaged in prescription bottles. (Tr. 106.)

Detective Lynes did not make any arrests. He estimated that he was in the house about an hour and one-half. (Tr. 92.)

**D. Alva Davis**

Alva Davis, a detective with the West Valley City Neighborhood Narcotics Unit with particular expertise in clandestine labs, testified that on February 10, 2004, he received a phone call from Detective Lynes requesting assistance at Defendant's residence. (Tr. 112-13, 126.) When he arrived, Officer Wyckoff explained that the officers thought that they had chemicals that might be involved in a meth lab. Detective Davis then talked to Defendant to find out what

10

chemicals they were referring to, who brought them there, and where and they were stored. Defendant responded that some people had left the chemicals at his house, and that he suspected that they would be used for a meth lab.  (Tr. 114, 130.)  Detective Davis stated that Defendant then changed his story, and said that the people who brought the chemicals "were not doing a meth lab, but were doing a forgery operation."  (Tr. 115, 130.)   Detective Davis did not receive any names as to who left the chemicals.  (Tr. 115, 130.)

Detective Davis did not advise Defendant of his Miranda rights because he was just trying to find out why he had called the police.  He was not a suspect at that time, was not in custody, and was free to leave.  (Tr. 115-16.)  Detective Davis had a casual demeanor and spoke to Defendant in a casual tone of voice.  (Tr. 117.)  Detective Davis testified that Defendant seemed anxious, but did not seem afraid or apprehensive about having him there; in fact, he was showing him around the house.  (Tr. 119.)

Detective Davis asked Defendant to show him the chemicals.  (Tr. 115, 117.)  Defendant led him out to the carport.  Detective Davis then asked for, and received, permission from Defendant to look around.  Detective Davis looked around the carport and a shed on the south side of the house. (Tr. 118, 131.)  In the carport, Detective Davis found several different chemicals.  He could not identify some of them because they were in unmarked containers.  He recalled seeing a bottle of mercury and a gallon-sized bottle of nitric acid.  He could not remember the other chemicals.  The only chemical that could be used in a drug lab was the nitric acid, which could be used to adjust the pH balance at the end of the manufacturing process.  (Tr.

11

118.)  Detective Davis stated, however, that he had never actually known of anyone using nitric

acid to adjust pH, especially in that amount.  (Tr. 118-19.)  Defendant pointed out the shed as one

of the places that these people were storing things.  In the shed, Detective Davis found an ice

chest containing scientific glassware.  (Tr. 119, 132.)

Detective Davis asked Defendant where else in the house these people might have stored

items.  (Tr. 120, 132.)  Defendant then showed him around the house, including an office

upstairs, the kitchen area, the living room, and the downstairs. (Tr. 120.)  In one of the basement

rooms, there were several guns.  (Tr. 121.)  Detective Davis was concerned about the guns

because Defendant was so anxious.  Detective Davis was not comfortable around Defendant and

the weapons.  (Tr. 121-22.)  He stated, however, that Defendant was not a suspect at that point.

(Tr. 122.)

Regarding the chemicals, Detective Davis stated that he did not find anything that he

would identify as precursor chemicals.  (Tr. 122.)  Thus, he could not process the material as a

clandestine lab.  He told Defendant that he would contact the health department to see if they

could help in getting rid of the chemicals.  (Tr. 122-23.)  However, when he contacted the health

department, he was told that it would be the responsibility of the homeowner to safely dispose of

the chemicals.  Detective Davis then explained that he believed the chemicals to be dangerous,

and asked the health department to come out and assess them.  The health department agreed to

come out the next day.  (Tr. 123.)  Detective Davis then explained to Defendant that it would be

his responsibility to dispose of the chemicals since they were on his property, but that the health department would come out and look at them to see if they needed to be involved.  (Tr. 123-24.)

Detective Davis stated that it seemed odd that people would bring chemicals to Defendant's home, but Defendant could not give their names.  That, along with Defendant's anxious demeanor, made Detective Davis believe that Defendant was under the influence of drugs, so he asked Defendant about his drug use.  Defendant responded that he used meth.  (Tr. 120-21, 124.)  Detective Davis testified that he did not Mirandize Defendant because he did not consider him a suspect; he was not detained; and was free to leave or to cut off the conversation at any time.  (Tr. 125.)

Detective Davis stated that he arrived at the residence around 5:30 or 6:00 p.m.  He was there for about an hour and probably left around 6:30 or 7:00 p.m.  All of the officers left at the same time.  (Tr. 126-27.)   Detective Davis admitted that from the time he arrived at Defendant's house, he thought there was a potentially serious situation because of a potential clan lab, and that it was his intention stay there until he had determined whether there was a clan lab to be cleaned up.  (Tr. 138-39.)

**E. Chad Evans**

Chad Evans, an officer with the West Valley narcotics unit, arrived at the scene about 6:00 p.m. after receiving a call from Detective Lynes.  (Tr. 141-42, 152.)  When he arrived, he went to the carport where there other officers and firemen were already present.  Everybody was just kind of milling around and walking freely through the house.  (Tr. 142, 152-53, 155.)  The

13

officers on the scene explained that Defendant had called the police to help him get rid of some unknown chemicals, and the police were trying to determine what those chemicals were. (Tr. 142-43.) Officer Evans helped look through the boxes of chemicals. (Tr. 143.)

He was then asked by Detective Lynes to interview defendant. Detective Lynes told him that Defendant had been involved in a drug-related incident in which he had pointed a gun at someone to get him out of the house. Detective Lynes wanted Officer Evans to question him about the incident. (Tr. 143.) Officer Evans' purpose in interviewing Defendant was to find out what firearms had been used, and what his involvement in drugs was. (Tr. 144.)

Officer Evans entered the house through the open carport door and found Defendant in his bedroom. (Tr. 144-45.) Officer Evans identified Defendant, and read him his Miranda rights. (Tr. 145, 146.) Defendant indicated that he understood his rights and was willing to speak with the officer. (Tr. 147.) Officer Evans stated that Defendant was being detained at that point, but he did believed that he had not been detained prior to that time. (Tr. 147-48.)

During the interview, Defendant was sitting on the bed and Officer Evans was standing next to the bed near the doorway to the bedroom. (Tr. 148.) Officer Evans asked Defendant about his personal drug use. Defendant responded that he used drugs, but that he did not consider himself to be addicted to drugs. He used illegal drugs approximately once a week, and his drug of choice was methamphetamine. (Tr. 148.) The last time he had used drugs was the past weekend. He stated that he had been using methamphetamine for approximately two years, and used two to four grams a week. (Tr. 149.) Defendant also used prescription drugs including

14

morphine, Lortab, and Vioxx.  He stated that he had prescriptions for those drugs.  However, the officers did not find any prescription bottles for them, although they found other prescription bottles.  (Tr. 149.)  Defendant stated that he had hurt his back and used morphine, Lortab, and Vioxx for pain relief.  (Tr. 149-50.)  Defendant admitted that at the time of the interview, he was under the influence of morphine, Lortab, and Vioxx.  However, Defendant seemed to understand Officer Evans' questions, and answered them appropriately.  Officer Evans asked about the guns in his house, and Defendant responded that he used them for target practice, hunting, and protection.  When asked from whom he needed protection, he stated "people in the drug trade." (Tr. 150.)  Defendant admitted that he was the owner of the guns.  (Tr. 150-51.)

When Officer Evans asked Defendant about the .25 caliber handgun, he related an incident that a occurred about a week earlier in which he pointed the gun at a person to make him leave the house.  He stated that this person was involved in the drug trade.  (Tr. 151, 156-57.) The interview lasted about thirty minutes, after which the officers left the scene.  (Tr. 152.)

## II. DISCUSSION

Defendant contends that his incriminating statements should be suppressed because they were not voluntary and were taken in violation of his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel.[2]  (Mem. in Re:  Def.'s Mot. to Suppress

---

[2]The Sixth Amendment right to counsel attaches when formal proceedings such as a formal charge or indictment are initiated.  United States v. Toles, 297 F.3d 959, 965 (10th Cir. 2002).  No formal proceedings had been instituted against Defendant at the time of the incident at issue.  Thus, the Sixth Amendment right to counsel had not attached.

in Re:  2-10-04 (hereinafter "Def.'s Mem.") at 21, Dkt. no. 73).  He also contends that the search

of his home and the seizure of the firearms were unlawful.

**A. Statements**

    **1.  Defendant's Statements Made Prior to <u>Miranda</u> Warnings**

        Defendant contends that his statements were taken in violation of the rules set forth in

<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), because he was questioned without the requisite

warnings.  However, <u>Miranda</u> warnings are not required unless a defendant is in custody.

<u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)(per curiam).  A person is not in custody for

<u>Miranda</u> purposes unless his "freedom of action is curtailed to a 'degree associated with formal

arrest.'"  <u>United States v. Erving L.</u>, 147 F.3d 1240, 1246 (10th Cir. 1998)(quoting <u>Berkemer v.

McCarty</u>, 468 U.S. 420, 440 (1984).  The test for determining whether a suspect is in custody is

whether a reasonable person in the defendant's position would have understood his situation to

be the functional equivalent of formal arrest.  <u>Erving L.</u>, 147 F.3d at 1246-47.

        Courts are less likely to find that the defendant was in custody when the questioning takes

place in his home.  <u>United States v. Ritchie</u>, 35 F.3d 1477, 1485 (10th Cir. 1994); 2 Wayne R.

LaFave, et al., <u>Criminal Procedure</u> § 6.6(e), at 532-33 (2d ed. 1984).  For example, in  <u>Beckwith

v. United States</u>, 425 U.S. 341 (1976), the defendant was questioned in his home by IRS agents

conducting a criminal tax investigation.  The defendant argued that the confrontation placed him

under "psychological restraints" that were the functional and legal equivalent of custodial

interrogation.  <u>Id.</u> at 345.  The Supreme Court rejected this argument, holding that given the

location of the interview, the non-coercive nature of the questioning, and the fact that he was not

deprived of his freedom in any significant way, the defendant was not in custody.  Id. at 345-48.

Similarly, in United States v. Rith, 164 F.3d 1323 (10th Cir. 1999), the Tenth Circuit held that the

defendant was not in custody when police came to his home, told him to sit at a table, and

interviewed him about his possession of illegal firearms.  Applying an objective standard, the

court held that the officers' conduct did not rise to the level of restraint associated with a formal

arrest.  Id. at 1331-32.  See also Erving L., 147 F.3d at 1246-48 (holding that juvenile suspect

questioned in his home was not in custody).

      Defendant contends that he was effectively detained or even "seized" in his own home,

and that a reasonable person would not believe that he was free to go.  In particular, he contends

that the officers suspected him of criminal activity from the beginning because they believed that

there might be a clandestine meth lab at his residence.  However, the officers testified repeatedly

that Defendant was not in custody during the police encounter, and that he was free to leave at

any time.  No evidence to the contrary was presented, and Defendant was not arrested.  Although

the officers eventually suspected Defendant of criminal activity, Miranda warnings are not

required simply because "the questioned person is one whom the police suspect."  Mathiason,

429 U.S. at 495.  See also Beckwith, 425 U.S. at 346-47 ("It was the compulsive aspect of

custodial interrogation, and not the strength or content of the government's suspicions at the time

the questioning was conducted, which led the court to impose the Miranda requirements with

regard to custodial questioning.")(quoting United States v. Caiello, 420 F.2d 471, 473 (2d Cir.

1969); California v. Beheler, 463 U.S. 1121 (1983)(per curiam)(rejecting the argument that because the defendant was a suspect in the investigation, he was in custody for Miranda purposes).

Defendant also complains that the officers would not leave his house.  While it is true that the officers testified that they intended to stay until they had completed their investigation, there is no evidence that they stayed without Defendant's permission.  Defendant summoned the police to his house.  No evidence was presented that either Defendant or his wife asked them to leave. Accordingly, because Defendant was not in custody, Miranda warnings were not required.

### 2. Voluntariness of the Statements

Defendant also contends that his statements were involuntary.  Even though Defendant's Miranda rights were not violated, his statements would still be inadmissible if they were made involuntarily.  United States v. Erekson, 70 F.3d 1153, 1157 (10th Cir. 1995); see United States v. Roman-Zarate, 115 F.3d 778, 783 (10th Cir. 1997); United States v. Chalan, 812 F.2d 1302, 1307 (10th Cir. 1987).  "Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne run afoul of the Fifth Amendment and are inadmissible at trial as evidence of guilt."  United States v. Glover, 104 F.3d 1570, 1579 (10th Cir. 1997); see Malloy v. Hogan, 378 U.S. 1, 7 (1964).  Coercive police activity is a necessary predicate to a finding that a statement was not voluntary.  Colorado v. Connelly, 479 U.S. 157, 167 (1986).

The determination of voluntariness is made on the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation.  United States v. Roman-Zarate, 115 F.3d 778, 783 (10th Cir. 1997); United States v. Erekson, 70 F.3d 1153, 1157 (10th Cir. 1995).  Factors to be considered are "(1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment."  Glover, 104 F.3d at 1579 (10th Cir. 1997).  See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  The government has the burden to prove that the statements were voluntary.  Lego v. Twomey, 404 U.S. 477, 489 (1972); United States v. Muniz, 1 F.3d 1018, 1021 (10th Cir. 1993).

Considering the above factors, no evidence was presented that Defendant was especially susceptible to having his will overborne based on his age, lack of education, or intelligence.  Defendant was not detained prior to questioning.  Although Defendant was not initially given his Miranda rights, he did eventually receive and waive his Miranda rights.  Defendant's encounter with police lasted no more that two hours.  The interview by Officer Evans lasted only about thirty minutes.  (Tr. 152.)  See Glover, 104 F.3d at 1580 (stating that conversation lasting no more than twenty minutes was not excessively long); Erekson, 70 F.3d at 1157 (same).  Finally, it is undisputed that Defendant was not subjected to physical punishment.

Defendant argues that he was subjected to coercive circumstances by the presence of so many armed officers in his home, who did not leave for a couple of hours.  Although Defendant

may have felt some pressure to talk to the officers, their mere presence and the asking of questions is not the type of government coercion necessary to a finding that a statement is involuntary.  Connelly, 479 U.S. at 167.  Accordingly, the court concludes that Defendant's statements were voluntary.

**B. Search of Defendant's House and Seizure of the Firearms**

Defendant contends that the search of his house and resultant seizure of his firearms violated the Fourth Amendment.  In response, the government contends that the search in the instant case was lawful, because it was conducted pursuant to Defendant's consent.

It is undisputed that the search and seizure were conducted without a warrant.  A warrantless search is presumptively unreasonable in the absence of some well-defined and limited exception to the warrant requirement such as consent.  Groh v. Ramirez, 124 S. Ct. 1284, 1290 (2004); Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971).  The Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so."  Florida v. Jimeno, 500 U.S. 248, 250-51 (1991).

The court determines the voluntariness of consent to a search under the "totality of the circumstances," with the government having the burden of proof.  United States v. Orrego-Fernandez, 78 F.3d 1497, 1505 (10th Cir. 1996); United States v. Iribe, 11 F.3d 1553, 1557 (10th Cir. 1993); United States v. Zapata, 997 F.2d 751, 758 (10th Cir. 1993).  See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  "To sustain its burden, 'the government must show that

there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given.'" Orrego-Fernandez, 78 F.3d at 1505 (quoting United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993)); accord Iribe, 11 F.3d at 1557. The scope of consent is measured under a standard of objective reasonableness–"what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 251.

In the instant case, Defendant invited the police into his home. The officers testified that Defendant repeatedly told them to follow him through various portions of the house where he pointed out areas where the "people" had left evidence of a crime such as forged identifications. Eventually, Detective Lynes asked Defendant if he could look around the house, and Defendant agreed. However, that request was in response to Defendant's statements that people had left things in his house which presumably were evidence of a crime. It was entirely reasonable for the officers to ask to look around the house in investigating a crime reported by the homeowner. Under the totality of the circumstances, the court concludes that Defendant consented to the search of his house.

Regarding the seizure of the firearms, the firearms were in plain view and were lawfully seized pursuant to the plain view doctrine. Officers may lawfully seize an item if the following conditions are met:

> (1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent–i.e.

the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself.

United States v. Soussi, 29 F.3d 565, 570 (10th Cir. 1994); United States v. Corral, 970 F.2d 719, 723 (10th Cir.1992); see Horton v. California, 496 U.S. 128, 136-37 (1990).  In the instant case, the officers were lawfully on the property and had access to the firearms at Defendant's invitation.  The incriminating nature of the firearms was immediately apparent since Defendant had admitted to being a user of illegal drugs.  Accordingly, the seizure of the firearms was lawful.

**C. Statement of Cheryl Roman**

Defendant also asks that the statements of his wife be suppressed because they were taken under coercive circumstances and without the benefit of Miranda warnings.  Defendant contends that the statements are therefore unreliable.  However, Defendant has no standing to contest a violation of his wife's Miranda rights.

**III. RECOMMENDATION**

Defendant's Miranda rights were not violated; his statements were voluntary; the search of his residence was conducted pursuant to consent; and the seizure of the firearms was lawful under the plain view doctrine.  Accordingly, the motion to suppress should be denied.  (Dkt. 15.)

It is further RECOMMENDED that pursuant to 18 U.S.C. § 3161(h)(1)(F) and (J), any order of the district judge regarding this Report and Recommendation should exclude from the

computation of the Speedy Trial Act, the time from the filing of the Motion to Suppress through the date of entry of the order of the district judge.

Copies of the foregoing Report and Recommendation are being mailed to the parties, who are hereby notified that they have the right to object to the Report and Recommendation.  The parties are further notified that they must file any objections to the Report and Recommendation with the clerk of the district court, pursuant to 28 U.S.C. § 636(b), within ten (10) days after receiving it.  Failure to file objections may constitute a waiver of those objections on subsequent appellate review.

DATED this 15th day of June, 2005.

David Nuffer
United States Magistrate Judge